## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REGIONAL PERFORMING ARTS CENTER, INC. d/b/a KIMMEL CENTER, INC.<br>1717 Arch Street<br>17th Floor<br>Philadelphia, PA 19103,<br><br>                    Plaintiff,<br>vs.<br><br>RAFAEL VINOLY ARCHITECTS, P.C.<br>50 Vandam Street,<br>New York, New York 10013,<br><br>                    Defendant. | CIVIL ACTION NO.: |

## COMPLAINT

Plaintiff Regional Performing Arts Center, Inc. d/b/a Kimmel Center, Inc., by and through its undersigned counsel, brings this action against Defendant Rafael Vinoly Architects, P.C. and alleges as follows:

1.      This action arises from an architect who had a grand vision but was unable to convert that vision into reality, causing the owner to incur significant additional expenses to correct and overcome the architect's errors and delays. This suit seeks to recover those expenses.

## THE PARTIES

2.      Plaintiff Regional Performing Arts Center, Inc. ("RPAC") is a Pennsylvania nonprofit corporation with its principal place of business located in Philadelphia, Pennsylvania and is doing business as Kimmel Center, Inc.

3.      RPAC manages the Regional Performing Arts Center which includes the Kimmel Center.

624303_4

4.      Defendant Rafael Vinoly Architects, P.C. ("RVA") is a New York professional corporation with its headquarters and principal place of business located in New York, New York.

## JURISDICTION AND VENUE

5.      Jurisdiction is appropriate pursuant to 28 U.S.C. §1332 in that diversity of citizenship exists between all of the parties involved in this matter.  Furthermore, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.      Venue is appropriate under 28 U.S.C. §1391(a)(2) in that a substantial part of the events or omissions giving rise to the claims asserted herein took place in this district.

7.      Furthermore in its agreement with RPAC, RVA irrevocably agreed to be subject to the jurisdiction and venue of the state courts of the Commonwealth of Pennsylvania or the United States District Court for the Eastern District of Pennsylvania.

## BACKGROUND

### A.      The Creation of the Kimmel Center

8.      For years dating back to 1986, there was a push by some members of the Philadelphia community to create a new home for the Philadelphia Orchestra.

9.      Then, in 1993, such a dream started to become a reality when Sidney Kimmel committed $12 million dollars towards the building of a new concert hall for the Philadelphia Orchestra.

10.     Despite the generous commitment by Sidney Kimmel, efforts once again stalled on creating a new home for the orchestra.

11.     A couple of years later things began to change with the Avenue of Arts project and there was a renewed effort to revive the need for a new concert hall for the orchestra.

12.     A committee was created to oversee the project for the new concert hall and this committee became RPAC.

13.     RPAC determined that the ability to hold a multitude of different performing arts permitted more public support to be garnered.  Accordingly, the plan for just a concert hall for the Philadelphia Orchestra was modified to building a performing arts center that would not only be the home for the orchestra, but would also be able to serve as a center for other performances such as dance, theater and music.

14.     With the change to a performing arts center, RPAC wanted to have something that would be a centerpiece for the Avenue of the Arts and a showcase to the world.

15.     RPAC envisioned a world-class, state-of-the-art concert hall for the Philadelphia Orchestra and an adaptable theater to accommodate various performances for music, dance and drama.  This new performing arts center would be known as the Kimmel Center.

16.     In order to match the grand vision of a world-class facility, the Kimmel Center needed to be a "world-class" structure.

17.     This "world-class structure" would have to be built within RPAC's budgetary constraints.  RPAC did not have an unlimited source of funds to work with and inasmuch as there was increased public support, such support only went so far for a performing arts center.

18.     Thus, it was critical to find an architect who could create and design a world-class structure within RPAC's budgetary constraints.

19.     After an exhaustive selection process, based on RVA's representations and prior works, RPAC believed that RVA could perform the task.

20.     Originally, RVA was to team with another architectural firm.  RVA would provide the overall design while the other firm was to convert the design into working drawings and specifications that the subcontractors would use in constructing the building.

21.     RVA convinced RPAC that RVA could perform both tasks and the second architectural firm was, therefore, unnecessary.

22.     On or about April 17, 1997, RPAC accepted RVA's proposal to perform certain architectural services in connection with the design and construction of the Kimmel Center for the fee of $8.9 million and authorized RVA to proceed with the design of the same.

## B.     Agreement with RVA

### 1.     RVA'S Required Performance and Services

23.     On September 30, 1997, the RVA entered into a written agreement with RPAC that formalized the terms and conditions of RVA's performance ("Agreement") with respect to the design and construction of a new 2,500 seat, world-class concert hall for the Philadelphia Orchestra and an adaptable theater, seating anywhere from 500 to 1,200 seats, for the performance of music, dance, drama and music theater ("the Project").  A copy of the Agreement is attached hereto as Exhibit "A" and the terms and conditions set forth therein are incorporated by reference.

24.     In paragraph 1.1.2 of the Agreement, RVA agreed to perform its work "as expeditiously as is consistent with professional skill and care and the orderly progress of the Work."

25.     Consistent with its representations of being a leading, critically acclaimed architectural firm, in paragraph 1.5 of the Agreement, RVA agreed that its "services shall be performed in a skillful and competent manner, exercising due and reasonable professional care, and shall comply with the highest professional standards of a nationally-recognized architectural firm and the standards and practices specified in this Agreement."

26.     RVA represented and agreed that its performance was to be held and judged according to a higher standard of care than normally accorded professional architects and

understood that RPAC was relying upon RVA's skills and expertise in connection with the design and construction of the Project.

27.     In paragraph 1.3.7, RVA acknowledged "the unique nature of th[e] Project and the reliance of [RPAC] on [RVA's] skill, judgment and ability to cooperate and coordinate with [RPAC], Construction Manager, Acoustical Consultant, Theater Consultant and other Design Disciplines."

28.     The Design Construction Team consisted of the following entities: L.F. Driscoll Co. and Artis T. Ore, Inc., Inc. a Joint Venture ("LFD"), who was the Construction Manager, Artec Consultants, Inc. ("Artec"), who was the Acoustical Consultant, Theatre Projects Consultants, Inc. ("Theatre Projects"), who was the Theater Consultant, and other design consultants and engineers involved in the design of the Project.

29.     Further, RVA agreed to, *inter alia*:

(a)     assist RPAC and the Construction Manager in developing an overall Project Schedule and integrating its performance with those of the Construction Manager's, Acoustical Consultant, Theater Consultant and other Design Disciplines through the completion of the Project (¶1.4 of the Agreement);

(b)     work closely with RPAC, the Construction Manager, Cost Consultant, Acoustical Consultant, Theater Consultant, and other Design Disciplines throughout the programming, schematic, design development, construction documents, bidding and construction phases and to cooperate at all times to achieve RPAC's program and budget requirements (¶2.1.2 of the Agreement);

(c)     promptly correct at no cost to RPAC any defective designs or specifications that RVA furnishes and will promptly reimburse RPAC for all damages

resulting from the use of such defective designs or specifications (¶2.1.3 of the Agreement);

(d)     be responsible for the coordination, completeness, accuracy and competent preparation of all drawings, specifications and design documents for the Project and for their compliance with all applicable codes, ordinances, regulations, laws and statutes (¶2.1.4 of the Agreement);

(e)     prepare, for RPAC's approval, Schematic Design Documents consisting of drawings and other documents illustrating the scale and relationship of the Project components, provide interior design services for the purpose of space planning and architectural design, and provide schematic design studies for review and evaluation by the Construction Manager, Cost Consultant, Acoustical Consultant, Theater Consultant and other Design Disciplines (¶2.2.1 of the Agreement);

(f)     provide drawings, outline specifications and other documents for use in preparing an estimate of the construction costs and, at all times, endeavor to design the Project within the Project Construction Cost Limit, which was defined as "the maximum cost permitted for the construction of the Project, which cost will be developed in accordance with the Project Schedule identified by [RPAC] from time to time as the Project Construction Cost Limit," and act promptly to revise the Schematic Design Documents at its sole cost and expense to ensure that the construction cost of the Project does not exceed the Project Construction Cost Limit (¶2.2.3 of the Agreement);

(g)     prepare Design Development Documents consisting of drawings and other documents to fix and describe the size and character of the Project as to architectural,

structural, mechanical and electrical systems, materials and such other elements as may be appropriate (¶2.3.1 of the Agreement);

(h)     provide drawings, outline specifications and other documents for use in preparing an estimate of the construction costs and, at all times, endeavor to design the Project within the Project Construction Cost Limit and act promptly to revise Design Development Documents at its sole cost and expense to ensure that the construction cost of the Project does not exceed the Project Construction Cost Limit (¶2.3.4 of the Agreement);

(i)     prepare Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project and that such Drawings and Specifications shall comply with all laws, rules, ordinances and codes and administrative interpretations thereof applicable to the Project (¶2.4.1 of the Agreement);

(j)     consult with and keep RPAC's representative, Construction Manager, Acoustical Consultant, Theater Consultant and other Design Disciplines informed of any changes in requirements or in construction materials, systems or equipment as the Construction Document Drawings and Specifications are developed and endeavor to design the Project within the Project Construction Cost Limit and act promptly to revise Construction Documents at its sole cost and expense to ensure that the construction cost of the Project does not exceed the Project Construction Cost Limit (¶2.4.3 of the Agreement);

(k)     assist RPAC and, as appropriate, the Construction Manager, Acoustical Consultant, Theater Consultant and other Design Disciplines in the preparation of the

necessary bidding information, bidding forms, the Conditions of the Contracts, and the forms of Subcontracts between Construction Manager and Contractors (¶2.4.4 of the Agreement);

(l)    cooperate with RPAC, based on understanding that certain subcontracts may be put out to bid prior to the conclusion of the Construction Document phase, such as demolition and excavation, and to the extent reasonably possible shall prepare Construction Document Drawings and Specifications as may be necessary to ensure the commencement and completion of the Work as promptly as possible (¶2.4.5 of the Agreement);

(m)    assist RPAC's Representative and Construction Manager in obtaining bids or negotiated proposals by rendering interpretations and clarifications of the Drawings and Specifications in appropriate written form (¶2.5.1 of the Agreement);

(n)    visit the Project site at intervals appropriate to the stage of construction or as otherwise agreed by RPAC and Architect in writing to become generally familiar with the progress and quality of the Work completed and to determine in general if the Work is proceeding in accordance with the requirements of the Contract Documents and all applicable laws, statutes, ordinances, codes, rules, regulations, orders and decrees (¶2.6.5 of the Agreement);

(o)    visit the Project site on other occasions necessary for the completion of the Work within the Contract Time, Contract Sum and Project Budget and will generally review the quality and quantity of the work on a regular and systematic basis and shall issue written reports pertaining to such site inspections which such reports shall specify, *inter alia*, the progress and quality of the work (¶2.6.5.1 of the Agreement);

(p)      review and approve or take other appropriate action upon Contractor's submittals such as Shop Drawings and Product Data and Samples with reasonable promptness as to cause no delay in the Work while allowing sufficient time to permit adequate review (¶2.6.12 of the Agreement);

(q)      assist RPAC and RPAC's representative in coordinating the work of the Construction Manager, Design Disciplines and the various consultants hired by RPAC (¶2.11.2 of the Agreement); and

(r)      attend Project meetings as frequently as necessary to ensure the design and completion of the Project in accordance with the Agreement and the Contract Documents and/or as reasonably requested by RPAC or RPAC's representative (¶2.11.4 of the Agreement).

30.      Overall, the above-mentioned services, as well as other services RVA was required to provide under the Agreement, were to be performed and coordinated with others working on the Project throughout the following Project phases: the Programming Phase, Schematic Design Phase, Design Development Phase, Construction Documents Phase, Bidding Phase and the Construction Phase.

31.      Under the Agreement, the $8.9 million that RVA was to receive for its services was to be paid in differing increments throughout each Project phase as follows:

(a)      Programming                $712,000

(b)      Schematic Design           $1,068,000

(c)      Design Development         $1,780,000

(d)      Construction Documents     $2,670,000

(e)      Bidding                    $445,000

    (f)      Construction                  $2,225,000

32.      The different Project phases were incorporated into the Project Schedule, which contained RVA's schedule of performance that set forth certain deadlines that RVA had to meet (paragraph 1.4 of the Agreement indicated that the Project Schedule shall include RVA's schedule for performance of its work). The Project Schedule was attached as Exhibit A to the Agreement.

### 2.     Project Schedule

33.      In the Agreement, the Project Schedule was defined as "the schedule, prepared by the Construction Manager in consultation with [RPAC], [RVA], Acoustical Consultant, Theater Consultant and other Design Disciplines and approved by [RPAC]."

34.      The Project Schedule created by RVA and incorporated into the Agreement (as Exhibit A thereto) set forth the following schedule for each phase of the work to be performed:

| Phase | Start and Finish Date |
| --- | --- |
| Schematic Design | 7/01/97 to 12/01/97 |
| Design Development | 12/01/97 to 5/01/98 |
| Construction Documents | 5//01/98 to 3/01/99 |
| Bidding | 8/01/98 to 5/01/99 |
| Construction | 9/01/98 to 9/01/01 |
| Fit Out and Tuning | 9/01/01 to 11/01/01 |

35.      As the schedule sets forth, the work in some of the phases overlapped with the bidding of subcontract work starting during the construction document phase and construction, in turn, commencing while bidding was still occurring and some of the construction documents were still being developed and finalized.

36.     For example, in August 1998, LFD would commence issuing some limited scope bid packages (*i.e.*, those designated for early bidding) to subcontractors for demolition (August 1998), concrete and foundation (August 1998), structural steel (September 1998) and building mechanical/electrical/plumbing ("MEP") (September 1998) before the construction documents were completed.

37.     It was critical for RVA to meet the deadline for completing the design documents because the issuance of the bid packages depended upon their completion.  That is, the later the design document for a particular Project item was finished, the later the bid package for such item could be issued.

38.     The reason that the schedule provided for the overlapping of some phases was to shorten the time-period for completion of the Project in order to make the opening date in November 2001.

39.     Meeting the opening date deadline was critical because the schedule for performances by the Philadelphia Orchestra and other artists were based on when the Kimmel Center was set to open.  Schedules for performances are not made overnight, but well in advance of when they actually take place and it is not easy to reschedule any one performance because of the effects it may have on other scheduled performances.

40.     Since the Kimmel Center was going to be the new "home" of the Philadelphia Orchestra, the orchestra needed to know and be assured when it would be completed since it was committing to perform at the Center and would lose money if it had to cease performances because the orchestra had to wait for the concert hall to be completed.

41.     It was made clear to RVA in the Agreement of the time sensitive nature of the Project and RVA agreed and accepted the requirement to plan and coordinate its work to meet the Project Schedule.

42.     In paragraph 11.1.2 of the Agreement, RVA recognized and acknowledged that "once the completion date has been established, [RPAC] will incur consider[able] expense and devote substantial time in planning and marketing the opening date of the Project and will make performance commitments in reliance upon the scheduled opening date."

43.     In addition, the Agreement required RVA to maintain sufficient progress of its work and provide adequate resources to maintain the schedule it agreed to perform.

44.     Paragraph 11.1.2 further provided that "[i]f RVA fails to comply with . . . the Project Schedule . . . and such failure is caused in whole or in part by the acts or omissions of [RVA] or [RVA's] agents, consultants or employees, [RVA] shall immediately employ such personnel, direct its employees to work overtime, increase the utilization of its Project Team and Key Personnel, and take whatever other steps are necessary in order to attain and maintain compliance with . . . the Project Schedule, at [RVA's] cost and expense to the extent such failure is attributable to the acts or omissions of [RVA] or [RVA's] agents, consultants or employees."

45.     Likewise, in paragraph 1.4.2, RVA agreed to exercise all reasonable means to complete its work within the Project Schedule, including the assignment of additional personnel to the Project and/or working its personnel on an overtime basis at no additional cost to RPAC.

46.     In line with such promise, RVA represented in paragraph 15.11.2 of the Agreement that "it is able to furnish any of the plant, tools, materials, supplies, equipment and labor required to complete  the services required [under the Agreement] and perform all of its obligations [under the Agreement] and has sufficient experience and competence to do so."

47.    Further, paragraph 1.4.3 of the Agreement made clear that time was of the essence and that RVA had to perform within the time periods specified in the Agreement including the most important requirement that the Project be completed and ready for occupancy by November 2001 (the opening of the Kimmel Center actually occurred in December 2001).

48.    The same paragraph also made clear RVA's understanding and acknowledgement that any delay in completing the Project will "materially affect [RPAC] by causing, among other things, loss of revenue, great inconvenience, increased administrative expense, and other tangible and intangible losses and damages" and that RPAC had "the right to hold [RVA] responsible for any losses incurred by [RPAC] in the event [RVA] fails to perform its Work in accordance with the Project Schedule."

49.    RPAC made a commitment to its donors and the City of Philadelphia that the Kimmel Center would open sometime in November-December 2001 and its entire focus was on fulfilling such commitment.

50.    Indeed, the Kimmel Center's success depended, in part, on the funds, commitments and support it received from its donors and the City of Philadelphia.  If the Kimmel Center did not open as promised, it could signal problems with the Project causing concern and/or disappointment with donors, thereby threatening the success of the Project.  Thus, having the Project ready for the opening date was critical not only because of the scheduled performances, but also to maintain and attract donor support.

51.    In short, RVA, who participated in preparing the Project Schedule, was all too aware of the significance of completing the Project by the opening date and its need to perform in accordance with the schedule in order to accomplish the same.

52.    Overall, while the overall duration of the construction from demolition to fit-out and tuning was only about 36 months, the Project Schedule allowed for sufficient design time and the timely start of construction in order to achieve the target date building occupancy within the required budget.

### C.    RVA'S Work on the Project

**1.    RVA Failed to Provide Timely, Adequate and Accurate Documents and Drawings and to Coordinate the Same with those of Others Working on the Project Causing RPAC to Incur Significant Damages.**

53.    RVA commenced its work on the Project shortly after its proposal was accepted in April 1997 and by November 1997, RVA had billed RPAC $1,352,000 for its work on the Project.

54.    RVA had basically billed for RPAC for all of the programming phase and about 65% of its work on the schematic design phase by November 1997.

55.    Thus, as of November 1997, based on its schedule of billing, RVA was basically in compliance with the Project Schedule.

56.    Unfortunately, as time would tell, RVA would not be able to maintain the necessary pace and its performance would fall behind in certain critical areas.

57.    In February 1998, LFD (the Construction Manager) furnished RPAC an estimate of $158 million to construct the Project based on the schematic design documents, which, at this point, included almost all of the major components for the Project, such as the concert hall, adaptable theater, parking garage, restaurants, vaulted ceiling, and the roof garden, and size of the building being 425,000 square feet.

58.    A final construction budget was established by RPAC at $157 million and agreed to by the Design Construction Team.

59.     It was understood by all parties involved, including RVA, that the $157 million would be the budget to construct the Project with the all of the aforementioned components and RVA never indicated that it could not design the Kimmel Center to be built within said amount.

60.     While RVA proceeded with its work on the design documents through February 1998, it was unable to meet the May 1, 1998 deadline for their completion and by November 1998, the projected completion of all the design documents was December 18, 1998, more than seven months later than originally scheduled, with a now anticipated issuance of the limited scope bid package items in mid January 1999, over four months later than what the Agreement called for (September 1, 1998 was the date the bid package for structural steel and August 1, 1998 for the concrete and foundation).

61.     The issuance of the limited scope bid package to mid January 1999 was based on RVA's claim that it would complete the design documents for the same by December 1998. With the issuance of the limited scope bid package by mid January 1999, it was anticipated that they would be awarded by early March 1999.

62.     However, RVA did not complete its work on the design documents as of December 1998, and as of January 1999, none of the design information supporting any of the bid packages, including the limited scope bid package, was completed and ready to be sent to the potential bidders.

63.     With respect to the steel bid package in particular (which involved one of the most critical aspects of the Project), the contract indicated issuance to subcontractors in September 1998, but was not actually received by LFD until mid February 1999, with the steel specifications being received at the very end of February.

64.     Because of the time needed to review the steel bid specifications issued by RVA, the pre-bid meeting that was held for the steel bid package in March 1999 (a meeting was held for the potential bidders to go over the steel bid package due to its complexity) and RVA having to issue additional information needed for bid package during March 1999, the steel package did not actually go out for bid until early April 1999, seven months behind schedule.

65.     Likewise, the bid package for the concrete and foundation that should have been issued in August 1998, was delayed and not received until early 1999 because of RVA's failure to provide the design documents within the time required.

66.     In fact, the Project Schedule in the Agreement called for **all** bids to be issued by March 1, 1999, and at that point, none of the bids had been sent out to the subcontractors due to RVA delays.  It was not until a month later that the steel and concrete packages were sent out to subcontractors for bidding.

67.     Around the time the concrete and structural steel bid packages were issued, RVA requested approximately an additional $3 million in compensation for its work, despite the fact that the Agreement provided that the total sum RVA was to receive was $8.9 million and the fact that, at this point, only the concrete and structural steel bid packages were issued and no construction had even taken place.

68.     RVA claimed that it could not complete the work absent payment of the additional money.

69.     RVA presented RPAC with a Hobson's choice: obtain another architect (if RPAC decided not to pay the additional sum) and face even further Project delays and even higher costs or pay the additional compensation and have RVA proceed forward (hopefully in a more timely manner) on the Project.

70.     RPAC paid the additional compensation because it could not afford to face any more major delays without endangering the completion of the Project.

71.     Even when the structural steel and concrete and foundation bid packages were issued in April 1999, they were still incomplete because the design documents for the same were incomplete and contained errors.

72.     As a result of the incomplete design documents and not wanting to fall even further behind the Project Schedule, LFD had to alter the bid and award process for all contracts than originally planned and the bid packages for the concrete and foundation and structural steel were sent out (several months behind schedule) incomplete.

73.     Because LFD was not able to put together a complete structural steel bid package or the concrete and foundation, LFD was unable to receive a traditional lump-sum bid and award the contract based on that bid and issue a notice to proceed.

74.     Furthermore, due to the incomplete structural steel design documents, revised design issuances had to be made to in order to complete that bid package and a second round of bidding occurred further delaying the construction on the Project.

75.     In this regard, subsequent design issuances were made in June 1999 to the structural steel documents in order to complete the bid package for the structural steel contract which had the effect of prolonging the award of such contract to Helmark Steel, Inc. ("HSI") to July 1999, four months longer than anticipated (anticipated a March 1999 award based on a mid January 1999 issuance of the bid package due to delay in providing the structural steel design documents the first time around), due to the second round of bidding that had to take place.

76.     In total, due to RVA's failure to timely provide and complete the design documents as required by the Agreement, there was a nine month delay from when the structural

steel package was supposed to be bid in September 1998 to when the contract for such package was finally awarded in July 1999. The problems associated with the design documents affected the remaining phases and work on the Project and attributed to further delays.

77.    Compounding the problems associated with RVA's performance in connection with the design documents, was RVA's failure to meet its commitment to complete all of the construction documents by the necessary deadlines. Under the Agreement, all construction documents were to be completed by March 1, 1999.

78.    The final construction drawings were not produced until December 15, 1999, more than nine months later than called for in the Agreement, and when they were received by LFD, they were incomplete and contained errors, including the construction documents for the structural steel and concrete and foundation.

79.    The late and incomplete construction documents, including those for structural steel, contributed to the delay in the commencement of the steel fabrication and erection and exacerbated the delays stemming from the late and incomplete design documents.

80.    Notably, the Agreement called for the actual erection of the structural steel for the general building aspect of the Kimmel Center to commence about 61 days after the award of the structural steel contract.

81.    Structural steel was needed to construct the general building as well as the concert hall and the recital theater contained within the general building. The start of the erection of the steel for the concert hall was to take place after the general building and the recital theater after the concert hall. Thus, the timing of the work on the concert hall and the recital theater was dependent upon what was happening with work on the general building.

82.     With the award of such contract to HSI in July 1999, the structural steel erection should have commenced in September 1999 for the general building, which is still several months later than originally planned in December 1998.

83.     Steel erection for the general building did not take place in September 1999 because the design and construction documents for the structural steel provided by RVA were late and incomplete.  Not surprisingly, the concert hall and the recital theater were constructed behind schedule due to the delays in the structural steel erection for the general building.

84.     In addition to supplanting missing information for the structural steel design documents, RVA was making numerous design changes after such contract was awarded, with HSI receiving new structural steel design drawings throughout August 1999 and again in December 1999.  The receipt of these documents for the structural steel was occurring more than a year after the required date for the structural steel design documents and several months after the required date for the construction documents concerning the same.

85.     Because HSI had to wait for RVA to provide it with complete and accurate design and construction documents and kept making revisions to the steel drawings, HSI was delayed in preparing erection and detail drawings to facilitate the order for steel fabrication and subsequent erection.

86.     Indeed, when RVA would issue revised designs, they often contained discrepancies with earlier versions that complicated the HSI's efforts in drafting erection and detail drawings and contributed to increased costs and Project delays.  And the number of revisions to the steel drawings made by RVA caused HSI's detailers to keep working on revisions rather than proceeding with new Project work.

87.    Thus, not only did the revised and incomplete steel design and construction documents impact HSI's ability to produce and get approval of its erection and detail drawings, it impacted HSI's ability to timely place the mill orders for the steel, which were pushed back to a time in the steel market that was unfavorable to steel vendees.

88.    Because of the adverse conditions in the steel market at the time the mill orders were placed, the cost and delay in the fabrication increased, causing further delays, especially to the start of the steel erection, and increasing the costs of the Project.

89.    Even if problems in the steel market had not even occurred, the fabrication and erection of the structural steel would still have been significantly delayed because HSI was unable to prepare its detail drawings for erection due to the aforementioned untimely, incomplete and error-laden design and construction documents provided by RVA.

90.    Likewise, RVA's failure to timely respond to requests for information concerning, *inter alia*, the erection drawings, review and/or respond to the detail drawings and coordinate the documents and drawings with those trades working on the structural steel attributed to the significant delay in the structural steel fabrication and erection for the general building.  These same failures plagued the structural steel work on the concert hall as well to some extent the recital theater.

91.    The aforementioned delays in the bidding and award of the structural steel contract, as well as those associated with the steel fabrication process, caused by the late and incomplete design and construction documents, caused the start of the structural steel erection, which is on the critical path to constructing the Project, to be delayed for over one year from December 1, 1998 to April 3, 2000.  This delay had a significant impact on the remaining work on

the Project whose opening date was essentially fixed due to the aforementioned issues relating to the scheduling of performances and donor commitment.

92.     With the lengthy delay to the start of the erection of the structural steel the time to complete the Project was severely compressed and caused the follow-on subcontractors, including the structural steel contractor, to have to accelerate their work to finish the Project on time.

93.     Indeed, the duration of the start of the steel erection through Project completion was reduced from 33 months to 17 months so that the Project could be completed by the planned opening date.

94.     The other limited scope bid package items, concrete and foundation and MEP, suffered impacts similar to those experienced in structural steel.

95.     For example, nearly all of the shop drawings for the concrete work required revision because of incomplete design and were not submitted as required by the Project Schedule deadlines.

96.     As previously mentioned, the award of the concrete subcontract was delayed several months until April 1999, and when the subcontractor for the concrete started to commence work on the foundation, the late and inaccurate drawings caused the concrete subcontractor to take two years as opposed to the one year originally scheduled to complete the foundation and other concrete superstructure work.

97.     That is, the concrete subcontractor could not make any steady progress on the foundation or otherwise effectively and efficiently utilize its resources because it constantly had to wait for RVA to issue the drawings for the concrete work, as well as for the revisions to the same, in order to obtain the complete and accurate information needed to properly perform the concrete work.

98.     In fact, even if RVA's work on the structural steel documents been timely and complete so as to have the steel ordered and fabricated as scheduled, the steel could not have been erected because the concrete work was not completed.

99.     The concrete subcontractor could simply not perform as needed because it did not have the necessary information when it needed to do so.

100.    Likewise, the documents submitted by RVA for the MEP were untimely, incomplete and error laden, requiring extensive revisions in order have complete, coordinated construction drawings.  These failures led to additional Project delays.

101.    While the failures of RVA that have been detailed thus far have been focused on the structural steel package and concrete (mainly because of its importance in the construction of the Project), not surprisingly, such failures were not strictly limited to such aspects of the Project. The same failures permeated throughout every trade on the Project.

102.    Just like with the steel and concrete bid package items, RVA failed to provide timely and complete documents and drawings on other Project trades and to coordinate their drawings with the drawings of others in order to have a complete and coordinated drawing from which the subcontractors could use in constructing the various aspects of the Project.

103.    The errors and omissions in documents and drawings submitted by RVA resulted in continuous design changes which delayed the progress of the work on the Project because the contractors had to continuously adjust to and figure out the additional and/or altered scope of the construction documents.  The requests for information that contractors many times submitted to try and understand the design changes led to Project delays.

104.    In addition, RVA would not timely respond to requests for documents or information asked for by consultants, Design Construction Team members or other tradesmen

working on the Project that were needed for their work.  This failure to timely respond to requests only exacerbated the delays caused by the incomplete drawings issued by RVA because the requests were sent to try and fill in or figure out the drawings.

105.    Despite repeated efforts by RPAC and LFD to try to resolve this lack of coordination by RVA and its other failures to provide timely and complete documentation in a manner that would keep the Project progressing on schedule, including several meetings held in the fall of 1999 and early 2000, the same problems with RVA's performance (or lack thereof) persisted throughout the course of the Project.

106.    This eventually led to LFD essentially performing what RVA was required to do in order to provide the subcontractors with the documentation, drawings and information they needed to do their work and get the Project completed on time.

107.    There was so much of a delay in the "front-end" of the construction process (*i.e.*, the foundation and erection of the steel frame), that in order to make up for the lost time, LFD and other subcontractors were forced to accelerate their work, including the utilization of overtime, extended work weeks and additional resources, to ensure that the Project would be completed on time, which significantly increased the Project's costs for which RPAC had to pay.

108.    Due to the delays caused by RVA's failure to provide timely and complete documents and drawings as required by the Agreement, RPAC incurred considerable costs in having to have work performed at an accelerated pace to meet the opening date.

109.    Project delays and the attendant acceleration costs were not the only result of RVA's deficient and defective design work.

110.     After the Kimmel Center opened (on time), RPAC identified numerous areas in the Kimmel Center that required added work, correction and/or repair that were directly attributable to RVA's insufficient design work.

111.     Post-opening areas that required additional work or repairs due to defective and/or deficient design included, *inter alia*, flooring, the HVAC system, the lighting system, signage, plumbing fixtures, box office design and locker facilities.

112.     The costs of performing such added work and repair work was borne by RPAC who did not have to sustain such additional costs had RVA performed as required.

113.     In addition to the repair costs and the costs associated with the Project delays, RPAC also had to pay additional sums to contractors for their disruption and inefficiency claims due to aforementioned failures by RVA.

114.     RPAC was also forced to pay increased costs associated with premium prices on work and materials because the errors and omissions in the documents and drawings submitted by RVA resulted in continuous design changes after the bid and award process, which added to and/or altered the scope of the construction contracts that were awarded.

115.     These design changes were incorporated into the construction contracts via change orders at a premium cost because of the lack of competitive bid pricing for the subject work (bid process and contract award already take place for the subject work).

116.     Additional work was also required for many of these change orders due to the timing of their issuance, such as repair and replacement work, and this resulted in higher costs.

117.     Overall, the quality of the documents and drawings produced by RVA was seriously deficient (error laden, incomplete, lacked coordination, etc.) and provided well beyond

Project deadlines which led to significant delays in the Project and added considerable and unnecessary costs to the Project that RPAC was forced to pay.

118.    While RVA was able to create a design for a performing arts center that matched the grand vision of RPAC, RVA was unable to properly perform the necessary tasks required of it in implement its design, such as preparing the working documents and drawings needed to construct the concept, and do so within the deadlines called for in the Agreement.

119.    After the Project was finally completed in the Summer of 2002 (several months after the opening date), RPAC began to study the costs in incurred on the Project and when all was said and done, the construction cost more than $180 million, which was significantly more than the $157 million originally budgeted for construction.

120.    RPAC determined that most, if not all, of the cost overruns it experienced were the result of RVA's performance on the Project.

**2.      Attempted Dispute Resolution with RVA**

121.    Before RPAC could pursue any claims against RVA for the failures in its performance, RPAC was required to make a good faith effort to mediate its dispute with RVA with a qualified mediator pursuant to paragraph 7.2 of the Agreement.

122.    RPAC initially notified RVA of its claim on July 22, 2003 and RVA claimed thereafter that there were issues concerning insurance coverage that its insurance company, as well as those of its consultants, needed to resolve and this process took many months.  Adding to that was the several months RVA spent on selecting counsel and consultants to review the claim, as well analyzing the claim.

123.    The parties also spent significant time on choosing a mediator.

124.    When all was said and done, it was not until the Spring of 2005 that the parties actually met with a mediator to try and resolve their differences.

125.    The mediation process continued for many months but was ultimately unsuccessful and the parties were unable to reach an acceptable resolution.

126.    RVA's counsel requested that the undersigned withhold from filing the Complaint to at least November 18, 2005, so as to give some additional time to attempt a settlement.

127.    At this point, mediation has concluded and since it failed to resolve the dispute, pursuant to paragraphs 7.2 and 7.3 of the Agreement, RPAC was free to institute this action against RVA.

## BREACH OF CONTRACT CLAIM

128.    RPAC incorporates herein by reference the allegations contained in paragraphs 1 through 127.

129.    As set forth above, in the Agreement, RVA was required to, *inter alia*, deliver drawings and documents (schematic, design, construction, etc.) in a timely and complete fashion, be responsible for the coordination, completeness, accuracy and competent preparation of all drawings, specifications and documents and making sure they set forth in detail the requirements for the construction of the Project and their compliance with all applicable codes, ordinances, regulations, laws and statutes, and act promptly to revise its documents at its sole cost and expense to ensure that the construction cost of the Project does not exceed the cost limits.

130.    As discussed in detail above, RVA breached the Agreement and failed to perform in accordance with the professional standards of care it fixed for itself (highest professional standards of a nationally-recognized architectural firm) therein by, *inter alia*, providing late and deficient documents and drawings.

131.    Furthermore, upon information and belief, RVA breached the Agreement by not having or committing sufficient personnel, resources or materials and/or having the knowledge necessary to prepare the working documents needed to accomplish the construction of the Project as it represented it could.

132.    While RVA may have been able to produce a concept for the Kimmel Center, it was wholly unable to prepare and draft the working documents needed to take the Project from the concept form to actual construction.  And in many ways, this is the most important part of what an architect does and is hired to perform.

133.    In addition, RVA breached the Agreement by not performing in accordance with the Project Schedule and taking appropriate measures to ensure its compliance with it as agreed.

134.    Contributing to its failures to maintain the Project Schedule was RVA failure to properly coordinate and cooperate with other trades and consultants working on the Project as required by the Agreement.

135.    The foregoing failures on the part of RVA led to the delays on the Project and caused RPAC to incur significant damages as a result.

136.    Due to RVA's breaches of the Agreement, RPAC incurred damages for Acceleration Costs, Construction Premiums and Remedial Work (Pre-Opening), Post-Opening Remedial Work and Repairs and Contractor Claims.

137.    It was RVA's responsibility to design a building that could be built within the budgetary constraints imposed and to ensure that it could perform as required.

138.    Unfortunately, RVA did neither and as a result, RPAC was left having to pay millions of dollars more than it should have.

139.    RPAC has performed, satisfied and otherwise discharged all conditions precedent to its right to claim damages against RVA.

140.    As a result of the foregoing breaches, RPAC has suffered damages and is entitled to recover an amount to be proven at trial but is in excess of $150,000.

**WHEREFORE**, RPAC demands that this Court enter judgment against RVA for damages in an amount in excess of $150,000 plus interest and for such other and further relief as the Court deems just and proper, including attorneys' fees allowed by law and the costs and disbursements of this action.

Dated:  November 23, 2005

**DILWORTH PAXSON LLP**

J. Bradford McIlvain
Attorney I.D. No.: 42390
Scott P. Shectman
Attorney I.D. No.: 92276
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103
(215) 575-7000 (TEL)
(215) 575-7200 (FAX)

Attorneys for Plaintiff Regional Performing Arts Center, Inc.